IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 4, 2018

**STATE OF TENNESSEE v. JASELYN GRANT**

**Appeal from the Criminal Court for Shelby County**
**No. 16-05304       Chris B. Craft, Judge**
_____

**No. W2017-00936-CCA-R3-CD**
_____

The Defendant, Jaselyn Grant, was convicted by a Shelby County Criminal Court jury of second degree murder, reckless endangerment, and aggravated assault and was sentenced to an effective twenty-year sentence. On appeal, the Defendant argues: (1) the trial court erred in admitting a photograph of the minor victim; (2) the trial court erred in allowing a witness to testify about statements the minor victim made to her; (3) the evidence is insufficient to sustain her convictions; and (4) the trial court erred in including a "defense of another" instruction in the jury charge. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Dewun R. Settle, Memphis, Tennessee, for the appellant, Jaselyn Grant.

Herbert H. Slatery, III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Glenda Adams and Marianne Bell, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

In the early hours of November 19, 2014, the Defendant[1] fatally shot Keara Crowder after pointing a gun at Crowder's twelve-old-son, T.P. Thereafter, the Shelby County Grand Jury indicted the Defendant for first degree premeditated murder in Count

_____

[1] We acknowledge that we do not use titles when referring to every witness. We intend no disrespect in doing so. Judge John Everett Williams believes that referring to witnesses without proper titles is disrespectful even though none is intended. He would prefer that every adult witness be referred to as Mr. and Mrs. or by his or her proper title.

1, attempted first degree murder in Count 2, employing a firearm during the commission of a dangerous felony in Count 3, and aggravated assault in Count 4.

**Pre-Trial Hearing.**  Immediately prior to the beginning of trial, the Defendant objected to the introduction of a photograph of the minor victim, T.P., that had been taken at the Child Advocacy Center the morning of the shooting  The State argued that this photograph was "important to show [T.P.] as he appeared on the day of the event" because he was twelve years old when the shooting occurred but was fourteen years old at the time of trial.  The State explained, "[T.P.'s] more mature [now] and that's important for the jury . . . to see why he did what he did during the incident."  The trial court, noting that it had tried two cases that week where forensic videos were presented to show the age of the child in child cases, ruled that the photograph of T.P. was admissible because it was "probative" and the court did not see "how the . . . defendant would be unfairly prejudice[ed] by it."  The photograph of T.P. was introduced without objection at trial.

**Trial.**  The proof showed that Keara Crowder and the Defendant entered into a relationship while Crowder was playing for the Lemoyne Owen College basketball team and the Defendant was a player's assistant while a student there.  Crowder and the Defendant maintained a relationship for many years, and in June 2014, they got married in Illinois.  In April 2014, they bought a home together, and the Defendant, Crowder, and T.P.,[2] Crowder's minor son, lived in the home together.  However, by November 2014, the Defendant and Crowder's relationship deteriorated, and Crowder decided to separate from the Defendant, although they continued to share a home.  Shortly after this separation, Crowder began dating Shanetta Hartfield, a woman she had met at work.

On November 18, 2014, Crowder picked up T.P. from the house, and they met Hartfield at a restaurant before going to Hartfield's home.  Later that evening, Crowder and Hartfield received several phone calls from the Defendant, who worked as an officer for the Memphis Police Department.  Only Crowder answered these calls, and when she did, she placed these calls on speaker phone so they could be heard by Hartfield and T.P..  During these calls, the Defendant said she wished Crowder were dead, instructed Crowder not to come home, and threatened to throw all of Crowder's personal belongings outside.  In the early hours of the morning on November 19, 2017, Crowder and T.P. returned to the home they shared with the Defendant.

Upon their arrival, Crowder parked in the garage, and she and T.P. entered the home.  As soon as they got inside, the Defendant grabbed Crowder's injured wrist, twisted it, and took her cell phone, which she had been using to talk to Hartfield as they entered the home.  Then the Defendant and Crowder began to have a "fist fight" in T.P.'s

---

[2] It is the policy of this court to identify minor victims by their initials only.

presence. When things calmed down, Crowder used T.P.'s cell phone to call Hartfield. During this conversation, the Defendant took T.P.'s cell phone from Crowder and threw it against a wall, breaking it, which prompted the Defendant and Crowder to begin arguing.

As Crowder and T.P. were about to leave the house, the Defendant got two pistols from her closet. The Defendant set one pistol on the television stand in the living room and kept the other pistol in her hand and then informed Crowder and T.P. that they were not leaving the home. The Defendant then pointed her pistol at T.P.'s head. T.P., who was twelve years old at the time, "was scared she was going to shoot [him]." Crowder told the Defendant to stop pointing the gun at T.P., and when the Defendant failed to lower her weapon, Crowder picked up the pistol from the television stand and pointed it at the Defendant. When the Defendant still refused to lower the gun she was aiming at T.P., Crowder hit the Defendant in the head with the butt end of the gun she had just picked up, and the Defendant and Crowder began fist fighting again.

At that point, Crowder and T.P. decided it was best to leave and walked toward the garage. On their way out of the house, Crowder placed her gun on the kitchen counter and never picked it up again. As Crowder and T.P. were about to enter the garage, the Defendant grabbed T.P. by his collar and pointed her gun at him. Crowder told the Defendant to stop, and when Crowder punched the Defendant in the face, the Defendant released T.P.

T.P. initially tried to exit the home through the garage, but Crowder was afraid that exiting through the garage would alert the neighbors of their domestic altercation. Crowder and T.P. then tried to leave through the front door, but the Defendant slammed the front door shut before they could exit the home. At that point, Crowder announced that she was going to get help, and the Defendant pointed her pistol at T.P. and told Crowder that if she left, T.P. would not be there when she got back. Crowder, who did not have a weapon, stepped in front of T.P and told him to run to get help because she was not going to let the Defendant shoot him. T.P. hesitated, but when Crowder told him to run a second time, he opened the front door and began running. T.P. heard gunshots fired and heard his mother scream as he was running from the house. He then ran across the street and hid behind his neighbor's truck. As T.P. was running toward this truck, he was aware that bullets were flying past him. The Defendant continued to fire shots at the truck, and T.P. heard bullets ricocheting off of the truck. A moment later, after the gunshots stopped, T.P. ran up the street and knocked on the doors of several homes until a woman talked to him through the door and called 9-1-1.

At the same time these events were unfolding, several neighbors heard shots fired and began looking out their windows to determine what was happening. John Simelton and his daughter Kayla heard at least three or four gunshots. Kayla looked out her

- 3 -

window and saw the Defendant standing outside searching for something before going inside her home and turning out the lights. Kayla then opened the door leading out to her garage and heard someone screaming. Donald Thomas, another neighbor, was awakened by several gunshots. After a short pause, Thomas heard additional shots fired. When Thomas peered outside his window, he saw the Defendant running around the side of his yard before returning to her house and turning out the lights. Moments later, Thomas heard Crowder ringing his doorbell; however, because he did not realize she was injured, he did not open his door. Thomas saw Crowder walk to another neighbor's home and ring the doorbell, but no one answered. As Crowder struggled to make her way across that neighbor's yard, she fell down and did not get back up. Thomas said he did not see the Defendant or Crowder with any weapons in their hands that night. Still another neighbor, Cheryl Smith, heard two loud sounds that awakened her. When the police knocked on her door a short time later, Smith saw a body lying her yard.

The paramedics arrived at the scene at 5:06 a.m. and attempted to treat Crowder. Although Crowder was alert and breathing, her shirt was soaked with blood, and she had at least three visible gunshot wounds to her right side. Upon examination, the paramedics learned that Crowder had also sustained gunshot wounds to her chest and right arm. Although Crowder was alive when the paramedics transported her to the Regional Medical Center, she later passed away from her injuries.

Dr. Zachary O'Neill, the assistant medical examiner for the West Tennessee Regional Forensic Center, performed Crowder's autopsy and detailed her injuries. He stated that Crowder was shot four times. Crowder had an entrance wound on her right side and as well as a cluster of wounds on her right side where a bullet had entered, exited, re-entered, before exiting at the center of her chest. Crowder also had an entrance to the back of her right arm and exit wound to the front of her right arm where a bullet passed through. Another bullet entered the left side of her neck and exited her back. Lastly, a bullet entered Crowder's lower back, injuring her liver, pancreas, stomach, small intestine, and large intestine before remaining inside her body. This bullet, which did the most damage, was "the wound that caused the lethal injuries[.]" Dr. O'Neill recovered the bullet that was lodged in Crowder's body.

Cervinia Braswell, a special agent with the Tennessee Bureau of Investigation, tested the bullet recovered from Crowder's body and concluded that it had been fired from the Defendant's Sig Sauer .40 caliber pistol, which was a police-issued handgun belonging to the Defendant that was recovered from the Defendant's home shortly after the shooting.

T.P. testified that in the days leading up to the shooting, he called his aunt, Keyana Jones, to inform her that the Defendant "was acting crazy" and had knocked his bedroom door down. Keyana Jones also testified at trial and confirmed the substance of T.P.'s phone call to her.

The Defendant testified on her own behalf. She stated that on November 17, 2014, she made a video that she claimed showed Crowder chasing her with a knife. This video was played for the jury. The Defendant said that when she got home from work on November 18, 2014, the house had been ransacked. The Defendant called Crowder and informed her that it was 1:30 a.m. on a school night, that the house was a mess, and that she needed to bring T.P. home.

The Defendant stated that when Crowder and T.P. arrived home approximately twenty minutes later, the Defendant and Crowder began arguing. Shortly thereafter, she said Crowder hit her a couple of times with a towel bar, and they began to fist fight. Then the Defendant, Crowder, and Hartfield argued over speaker phone before the Defendant and Crowder began fist fighting again in the living room. During this physical altercation, the Defendant said Crowder grabbed a knife, and the Defendant ran into the garage and tried to open the garage so she could escape, but T.P. kept closing the garage door. The Defendant and Crowder went back into the living room, and while they were arguing, the Defendant said Crowder hit her several times with the butt end of a gun and then pointed the gun at her and threatened to kill her. The Defendant said that the gun Crowder hit her with was Crowder's own gun. At that point, the Defendant told T.P. to call the police and heard him run out the door. The Defendant said that after T.P. left, Crowder hit her a few more times. When Crowder continued to point the gun at her and kept threatening to kill her, the Defendant said she reached into her pocket, grabbed her pistol, and shot Crowder. The Defendant stated that she was "terrified" when she fired the shots and believed she was going to die. After firing the shots, the Defendant ran outside to try to escape. When she was unable to find T.P. or Crowder, the Defendant went back inside her home and called 9-1-1.

The Defendant denied ever pointing a gun at T.P., Crowder's son. She acknowledged that she had received training as a Crisis Intervention Officer and that she had experience in diffusing situations in which individuals were upset.

Following deliberation, the jury acquitted the Defendant of the employment of a firearm charge in count 3 but convicted her of the lesser included offenses of second degree murder in count 1 and reckless endangerment in count 2 as well as the charged offense of aggravated assault in count 4.

## ANALYSIS

**I. Admission of the Photograph.** The Defendant argues that the trial court erred in admitting a photograph of T.P. that was taken a few hours after his mother's death. She claims that the photograph was irrelevant, that it had no probative value and was

unfairly prejudicial, and that it was cumulative to the other evidence presented at trial. We agree with the State that the Defendant has waived this issue. Waiver notwithstanding, we conclude that admission of the photograph was not plain error.

Initially, we note that the Defendant has waived this issue by failing to include it in her motion or amended motion for new trial. See Tenn. R. App. P. 3(e); Tenn. R. App. P. 36(a). Moreover, the Defendant has failed to request plain error relief as to this issue and, consequently, has failed to provide any analysis of the five factors required for plain error review.

The plain error doctrine states that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). In order for this court to find plain error,

> "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "[P]lain error must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (internal quotations marks omitted). "It is the accused's burden to persuade an appellate court that the trial court committed plain error." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) (citing United States v. Olano, 507 U.S. 725, 734 (1993)). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283. A recognition of plain error "should be limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." Adkisson, 899 S.W.2d at 642. We must now consider these five factors in determining whether the Defendant is entitled to plain error relief.

The Defendant argues that the photograph at issue was irrelevant because T.P.'s "height and weight" did not make the existence of any fact that was of consequence to the determination of the action more or less probable than it would be without the evidence.. She also contends that the photograph should have been excluded because T.P.'s "height, weight or how he looked at the age of twelve was not probative" of whether she was

- 6 -

guilty of the crimes charged and because the photograph was only introduced to elicit sympathy. Finally, the Defendant asserts that the photograph "was cumulative to [T.P.]'s appearance in the courtroom and his statement under oath that he had gotten taller" since the incident.

"Generally, the admissibility of evidence rests within the trial court's sound discretion, and the appellate court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010) (citing State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007)). A trial court is found to have abused its discretion when it applies "an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" Lewis, 235 S.W.3d at 141 (quoting State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006)).

We conclude that the admission of the photograph of T.P. was not plain error. Photographs, like other evidence, are admissible if they are relevant and if their probative value is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. See Tenn. R. Evid. 401, 403. The photograph at issue meets these criteria. This picture, which can best be described as a "head shot" of a composed T.P. that was taken at the Child Advocacy Center, accurately depicts T.P.'s age at the time of the incident. This photograph assisted the jury in evaluating T.P.'s actions the night of the shooting. It also helped the jury determine whether Crowder used lawful force against the Defendant in order to protect T.P., which impacted the success of the Defendant's self-defense claim. For these reasons, we conclude that the probative value of this photograph was not substantially outweighed by the danger of unfair prejudice or by the needless presentation of cumulative evidence. Because the Defendant has failed to carry her burden of persuasion that a clear and unequivocal rule of law was breached, that a substantial right belonging to her was adversely affected, or that consideration of the error was necessary to do substantial justice, we conclude that the Defendant is not entitled to plain error relief regarding the admission of this photograph.

**II. Admission of the Phone Conversation.** The Defendant also argues that the trial court erred in allowing Keyana Jones, T.P.'s aunt, to testify about statements T.P. made to her a few days prior to the shooting. The Defendant asserts that Jones's testimony was inadmissible hearsay and that its admission violated her right to confront T.P. Again, we agree with the State's assertion that the Defendant has waived this issue. In any case, we conclude that the trial court did not commit plain error in admitting Jones's testimony.

At trial, T.P. testified that in the days leading up to the shooting, he called his aunt, Keyana Jones, to inform her that the Defendant "was acting crazy" and had knocked down his bedroom door. When Jones later testified that she called T.P. after the Defendant told her T.P. had been disrespectful to her, defense counsel objected, arguing that Jones's testimony about T.P.'s statements was hearsay and was cumulative to T.P.'s earlier testimony regarding this phone call. During a bench conference outside the hearing of the jury, the trial court stated:

> Well, . . . if it's a prior consistent statement, [the State] can admit it only if he's been asked about it first and [the defense has] been able to cross-examine [him]. So if he's testified that he said something, then [the State] can bring it out that he said it not as substantive evidence but to corroborate his testimony. So in that case[,] it's not hearsay and . . . he was subject to cross-examination. Now if they never asked him about that statement, he never says it, then they can't put on extrinsic proof of it[.] But I think [the State has] asked him about what he said and so [it] has a right to ask [Jones] that [question]. It's not being submitted for the truth of the statement. It's being submitted to show that when he talked about it he was telling the truth.

Thereafter, Jones testified that she called T.P., asked him why he was being disrespectful to the Defendant, and told him that whatever the Defendant and Crowder were going through was not his business. T.P. replied that the Defendant was "putting on a show" and "ha[d]n't told [her] everything." T.P. then told Jones that the Defendant was "mean to him whenever she's angry at his mother," that she "called him names," and that when he closed his door because she continued to call him names, the Defendant "tore his door down." Jones stated that T.P. "was upset" when discussing these things during their phone call.

We agree with the State that the Defendant has waived this issue by failing to include it in her motion or amended motion for new trial. See Tenn. R. App. P. 3(e); Tenn. R. App. P. 36(a). We also note that the Defendant, once again, has failed to request plain error relief and has failed to provide any analysis of the five factors required for plain error review.

As we previously explained, the Defendant is not entitled to relief absent plain error. See Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."); Tenn. R. Evid. 103(d) ("Nothing in this rule precludes taking notice of

- 8 -

plain errors affecting substantial rights although they were not brought to the attention of the court."); Adkisson, 899 S.W.2d at 641-42 (establishing the five factors that should be considered by this court when determining whether an error is "plain error").

First, the Defendant argues that Jones's testimony was inadmissible hearsay. She claims that none of the hearsay exceptions in Rule 803 applied and that Jones's testimony was inadmissible under Rule 804 because T.P., the declarant, was not unavailable. See Tenn. R. Evid. 803, 804. We note that hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "Hearsay is not admissible except as provided by these rules or otherwise by law." Tenn. R. Evid. 802.

In determining whether a statement is hearsay and, if so, whether it fits within one of the hearsay exceptions, a trial court may make factual findings and credibility determinations in ruling on an evidentiary motion, and "these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them." Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015) (citing State v. Gilley, 297 S.W.3d 739, 759-61 (Tenn. Crim. App. 2008)). However, "[o]nce the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one of the exceptions to the hearsay rule— are questions of law subject to de novo review." Id. (citing State v. Schiefelbein, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); Keisling v. Keisling, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)).

Here, T.P.'s statements to Jones qualify as a prior consistent statement. "Prior consistent statements are generally not admissible to bolster the testimony of a witness." State v. Herron, 461 S.W.3d 890, 904-05 (Tenn. 2015) (citing Farmer v. State, 296 S.W.2d 879, 882 (Tenn. 1956); State v. Hodge, 989 S.W.2d 717, 725 (Tenn. Crim. App. 1998); State v. Meeks, 867 S.W.2d 361, 374 (Tenn. Crim. App. 1993); State v. Braggs, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980)). However, a prior consistent statement may be admissible as an exception to the rule against hearsay "to rehabilitate a witness whose testimony is attacked on cross-examination as 'recent fabrication' or 'deliberate falsehood.'" Id. at 905 (quoting State v. Benton, 759 S.W.2d 427, 433 (Tenn. Crim. App. 1988)). In such cases, a prior consistent statement can be used "as a means of rebuffing such attacks and showing that the witness's trial testimony is consistent with statements made before any improper influence or motive to lie existed." Id. (citing Sutton v. State, 291 S.W. 1069, 1070 (Tenn. 1927)). Before a prior consistent statement becomes admissible, "the witness'[s] testimony must have been assailed or seriously questioned to the extent that the witness'[s] credibility needs shoring up." Benton, 759 S.W.2d at 433-34; see State v. Kendricks, 891 S.W.2d 597, 603 (Tenn. 1994) (holding that a prior consistent statement is admissible as rehabilitative evidence only after a witness's

credibility has been attacked). However, "[t]he impeaching attack on the witness's credibility need not be successful for admissibility of the prior consistent statement." State v. Albert R. Neese, No. M2005-00752-CCA-R3-CD, 2006 WL 3831387, at *6 (Tenn. Crim. App. Dec. 15, 2006). A prior consistent statement used to rehabilitate a witness is not hearsay because it is not offered for the truth of the matter asserted. Herron, 461 S.W.3d at 905; see Tenn. R. Evid. 801(c).

The record shows that the defense repeatedly attempted to attack T.P.'s credibility at trial by insinuating that T.P. had testified untruthfully about the Defendant's abuse of him and his mother and about the events leading up to the shooting. Because the defense tried to impeach T.P.'s credibility, in part, by challenging his claim that the Defendant was responsible for tearing down his door in the days prior to the shooting, the trial court properly allowed the State to ask Jones about T.P.'s statements to her regarding the damage to his door. In our view, Jones's very brief testimony about T.P.'s statements concerning the door did not exceed the scope of the rehabilitation warranted by the defense's attack on T.P.'s credibility during cross-examination. Cf. State v. Livingston, 907 S.W.2d 392, 398 (Tenn. 1995) (holding that a twenty-minute audio recording in which the minor rape victim detailed the crime to a Child Protective Services agent and the agent made judgmental remarks about the defendant was not admissible as a prior consistent statement because it exceeded the scope of rehabilitation warranted by the "mild[]" cross-examination). Finally, we recognize that although the defense had to right to request a limiting instruction, informing the jury that Jones's testimony was to be used only to rehabilitate the T.P.'s credibility and not as substantive evidence of the truth of the matter asserted, no such request was made in this case. See Herron, 461 S.W.3d at 905. The record shows that Jones's testimony was consistent with T.P.'s testimony about the damage the Defendant did to his door and served to rehabilitate T.P.'s credibility after the defense attempted to show T.P. was untruthful. Accordingly, we conclude that T.P.'s statements to Jones were admissible as prior consistent statements.

The Defendant also claims that the admission of Jones's testimony violated her right to confront T.P. on cross-examination. See U.S. Const. amend. VI, XIV; Tenn. Const. art. I, § 9. She asserts that because T.P. never testified about the phone conversation on direct examination, defense counsel was denied the opportunity to cross-examine him on this issue. Despite the Defendant's claims to the contrary, the trial transcript shows that T.P. testified about his conversation with Jones on direct examination and that the Defendant had an opportunity to cross-examine him about this testimony.

For all these reasons, we conclude that the trial court did not abuse its discretion in admitting Jones's testimony. Because the Defendant has failed to carry her burden of persuasion that a clear and unequivocal rule of law was breached, that a substantial right

belonging to her was adversely affected, or that consideration of the error was necessary to do substantial justice, we conclude that the Defendant is not entitled to plain error relief regarding the admission of this testimony.

       **III.  Sufficiency of Evidence.**  The Defendant next raises a general challenge to the sufficiency of the evidence supporting her convictions. She does not argue that the elements of any particular conviction offense were not satisfied; instead, she claims that T.P.'s testimony "lacked credibility" and that "no reasonable trier of fact should have given his testimony any weight." She also claims the trial court erred in failing to set aside the jury verdict as "thirteenth juror" and erred in failing to grant her motion for new trial. As support for this claim, she identifies minor, and sometimes nonexistent, inconsistencies between T.P.'s testimony and the Defendant's testimony. We conclude that the jury, not this court, determines the credibility of witnesses and that the evidence is sufficient to sustain the Defendant's convictions. Moreover, because the proof is sufficient to support these convictions, we conclude that the trial court did not err in exercising its role as the thirteenth juror or in denying the motion for new trial.

       When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). When evaluating the sufficiency of the convicting evidence, this court must determine "'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e).

       Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences

- 11 -

to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

Regarding the Defendant's claim that T.P.'s testimony lacked credibility and was not entitled to any weight, we agree with the State that this argument is essentially a request for this court to reweigh the evidence presented at trial. As we previously noted, the jury is responsible for evaluating the credibility of the witnesses, determining the weight given to testimony, and reconciling all conflicts in the proof. See Campbell, 245 S.W.3d at 335. "[A] jury's verdict will not be overturned unless there are inaccuracies or inconsistencies that 'are so improbable or unsatisfactory as to create a reasonable doubt of the [defendant's] guilt.'" State v. Elkins, 102 S.W.3d 578, 582-83 (Tenn. 2003) (quoting State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999)). Here, the inconsistencies between T.P.'s testimony and the Defendant's testimony fail to create a reasonable doubt of the Defendant's guilt. The jury, by its verdict, chose to accredit T.P.'s testimony over the Defendant's testimony, and we decline to re-weigh this evidence. See Wagner, 382 S.W.3d at 297.

Because the Defendant makes a general challenge regarding the insufficiency of the evidence, we will briefly address the proof as it relates to her convictions for second degree murder, reckless endangerment, and aggravated assault. Second degree murder is defined as "[a] knowing killing of another," T.C.A. § 39-13-210(a)(1), and is a result-of-conduct offense, State v. Brown, 311 S.W.3d 422, 432 (Tenn. 2010). Therefore, as relevant in this case, a person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b). Here, the Defendant admitted that she pulled out her pistol and shot Crowder several times. T.P. testified that Crowder placed her handgun on the kitchen counter and that at the time of the shooting, the Defendant was the only person with a weapon. He also said that he heard gunshots fired and heard Crowder scream as he ran away from their home. Neighbors Kayla Simelton and Donald Thomas testified that they heard gunshots and then saw the Defendant standing outside before she returned to her home and turned out the lights. Special Agent Braswell testified that the bullet that was recovered from Crowder's body was fired by Defendant's Sig Sauer .40 caliber pistol. Given this evidence, a rational jury could have found the Defendant guilty of second degree murder.

Next, a person commits the offense of reckless endangerment "who recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." Id. § 39-13-103(a). A person acts recklessly when the person

"is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint." Id. § 39-11-302(d). T.P. testified that after he ran out of the house, he observed bullets flying past him and heard bullets ricocheting off the truck he was hiding behind. A rational jury could have found the Defendant guilty of reckless endangerment based on this proof.

In addition, to sustain a conviction for aggravated assault as charged in this case, the State had to prove that the Defendant intentionally or knowingly caused T.P. to reasonably fear imminent bodily injury by the use or display of a deadly weapon. See id. §§ 39-13-102(a)(1)(A)(iii),-101(a)(2) (2014). "Aggravated assault based on fear requires the victim to have a 'well-grounded apprehension of personal injury or violence.'" State v. Lonta Montrell Burress, Jr., No. E2013-01697-CCA-R3-CD, 2014 WL 6855226, at *8 (Tenn. Crim. App. Dec. 4, 2014) (quoting State v. Jones, 789 S.W.2d 545, 550-51 (Tenn. 1990)). In accordance with the State's election as to this count, T.P. testified that the Defendant pointed a gun at him while standing near the television stand in the living room before any gunshots were fired. Given this evidence, a rational jury could have found the Defendant guilty of aggravated assault. Accordingly, we conclude that the evidence is sufficient to sustain the Defendant's convictions for second degree murder, reckless endangerment, and aggravated assault.

Finally, we will address the Defendant's claims that the trial court erred in failing to set aside the jury verdict as "thirteenth juror" and erred in failing to grant her motion for new trial. Tennessee Rule of Criminal Procedure 33(d) states that "the trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." Only if the record contains statements by the trial judge indicating disagreement with the jury's verdict or evidencing the trial judge's refusal to act as the thirteenth juror may an appellate court reverse the trial court's judgment. State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995). Otherwise, appellate review is limited to sufficiency of the evidence pursuant to Rule 13(e) of the Tennessee Rules of Appellate Procedure. State v. Burlison, 868 S.W.2d 713, 718-19 (Tenn. Crim. App. 1993). If this court determines that the trial judge has failed to fulfill his or her role as thirteenth juror, then we must grant a new trial. State v. Moats, 906 S.W.2d 431, 435 (Tenn. 1995).

The Defendant has failed to provide any supporting argument for this issue other than identifying some minor inconsistencies between T.P.'s testimony and the Defendant's testimony and has failed to identify any statements by the trial court indicating disagreement with the jury verdict. The trial transcript clearly shows that the trial court properly exercised its role as the thirteenth juror and approved with the jury's

- 13 -

verdicts immediately after they were announced. Because the proof is sufficient to support the Defendant's convictions for second degree murder, reckless endangerment, and aggravated assault, we conclude that the trial court properly exercised its role as the thirteenth juror.

As for the Defendant's claim that the trial court erred in denying his motion for new trial, we conclude that the Defendant has waived this issue by failing to include a transcript from the motion for new trial hearing in the appellate record. See Tenn. R. App. P. 24(b); State v. Ballard, 855 S.W.2d 557, 560-61 (Tenn. 1993). Waiver notwithstanding, we note that the decision to deny a motion for new trial is within the trial court's sound discretion. See Tenn. R. Crim. P. 33(a). Because we have already concluded that the evidence is sufficient to sustain the Defendant's convictions, we conclude that the trial court acted within its discretion in denying the motion for new trial on this basis.

**IV. <u>Defense of Third Party Instruction.</u>** Lastly, the Defendant contends that the trial court erred in providing a "defense of another" instruction to the jury. She claims that this instruction confused the jury and shifted the burden of proof from the State to the defense. She also asserts that this instruction should never have been given because the State failed to prove that her actions the night of the incident were unlawful. As support, the Defendant reiterates her claim that T.P.'s testimony, which indicated that Crowder was justified in attacking the Defendant, was not credible and that the Defendant's own testimony should be entitled to greater deference. We conclude that the Defendant has waived this issue by failing to support her argument with citations to legal authority, see Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7), and that, waiver notwithstanding, the Defendant is not entitled to relief.

After the State rested its case-in-chief, the trial court, during a hearing outside the presence of the jury, informed the parties that it was considering charging the jury with the "defense of another" instruction, which is also known as the defense of third party instruction. See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 40.07. The court said that if the Defendant alleged self-defense and the jury believed that the Defendant had pointed a gun at T.P., then Crowder would have a right to protect T.P. by attacking the Defendant. It said that if the proof or the defense's arguments suggested that Crowder did not have the right to hit the Defendant with her gun, then it would charge the jury with the "defense of another" instruction. The trial court said it was informing the parties of this possibility because the Defendant would have to decide whether she would testify and what her defense at trial would be.

During a jury-out hearing following the close of all proof, defense counsel objected to the "defense of another" instruction. She argued that only the self-defense

instruction should be charged because the defense of third party instruction was "a defense to prosecution" that was inapplicable to the Defendant's case." In addition, citing State v. Belser, 945 S.W.2d 776, 781-83 (Tenn. Crim. App. 1996), defense counsel argued that this instruction impermissibly shifted the burden of proof from the State to the Defendant and would confuse the jury. The State replied that the instruction was proper because if the jury believed the State's witnesses, Crowder was acting lawfully at the time she hit the Defendant with the gun because she was defending T.P.. Ultimately, the trial court held that it would provide the "defense of another" instruction because "if [Crowder] was defending her child from the action of the [D]efendant, then the [D]efendant would not have a right of self-defense from a strike on the arm [by Crowder]."

During the jury charge, the trial court provided an instruction on self-defense that substantially followed the self-defense pattern jury instruction. See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 40.06(b). The court then provided the following instruction on "defense of another," which extensively tracked the pattern jury instruction for defense of third party:

> Defense of Another. A person is justified in using force against another to protect a third person if one, under the circumstances as the person reasonable believed them to be, the person would be justified under the principles which apply to self-defense, in threatening or using force to protect against the use or attempted use of unlawful force reasonably believed to be threatening the third person sought to be protected; and two, that the person reasonably believes that the intervention is immediately necessary to protect the third person.

See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 40.07.

"[A] defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." Dorantes, 331 S.W.3d at 390 (citing State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005); State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001); State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000)). The propriety of a jury instruction, which is a mixed question of law and fact, is reviewed by this court de novo with no presumption of

- 15 -

correctness. State v. Fayne, 451 S.W.3d 362, 373 (Tenn. 2014) (citing State v. Rush, 50 S.W.3d 424, 427 (Tenn. 2001); State v. Smiley, 38 S.W.3d 521, 524 (Tenn. 2001)).

When reviewing challenged jury instructions, this court must "view the instruction in the context of the charge as a whole." State v. Clark, 452 S.W.3d 268, 295 (Tenn. 2014) (citing State v. Rimmer, 250 S.W.3d 12, 31 (Tenn. 2008); State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997)). When a challenged instruction is so erroneous that the instruction alone infected the entire trial and resulted in a conviction that violates due process or when the judge's charge, taken as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law, such deficiencies constitute prejudicial error requiring reversal. Id.

Here, the trial court charged the jury with the self-defense instruction before charging the jury with the "defense of another" instruction. The trial court determined that the "defense of another" instruction should be given because it assisted the jury in determining whether Crowder's actions, in hitting the Defendant prior to the shooting, were unlawful. The court wanted to clarify that if the jury found that Crowder was protecting T.P. when she hit the Defendant with her gun prior to the shooting, then the jury could find that Crowder was acting lawfully, which would preclude a finding that the Defendant shot Crowder in self-defense.

A review of the defense of third party pattern jury instruction shows that this instruction was meant to be a defense to prosecution for a defendant and not a means for justifying a victim's conduct. See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 40.07. Because the "defense of another" instruction was not warranted by the facts in this case, see Belser, 945 S.W.2d at 782, we conclude that it was error for the trial court to provide this charge to the jury. Nevertheless, we also conclude, under the facts in this case, that the trial court's error in providing the "defense of another" instruction was harmless beyond a reasonable doubt when viewed in the context of the entire charge.[3] See id. at 782-83. This instruction did not contribute to the verdicts in this case because it mirrored concepts that were included in the self-defense instruction. See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 40.06(b) (stating that the defendant "would have a right to use force against the deceased when and to the degree the defendant reasonably believed the force was immediately necessary to protect against the [deceased's] use or attempted use of unlawful force" and that "the use of force against the deceased would not have been justified if the defendant provoked the deceased's use of unlawful force . . . ."); Cf. State v. Perrier, 536 S.W.3d 388, 405 (Tenn. 2017) (concluding that "under the facts of this

_____

[3] "The test used to determine whether a non-structural constitutional error is harmless is whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008) (internal citation and quotation marks omitted).

- 16 -

case, the trial court's error in instructing the jury was harmless beyond a reasonable doubt "because no reasonable jury would have accepted the defendant's self-defense theory" (internal footnote omitted)).  After providing the self-defense charge, the trial court instructed the jury that the burden was on the State to prove beyond a reasonable doubt that the defendant did not act in self-defense, which "mitigate[ed] any adverse consequences from the erroneous charge."  Belser, 945 S.W.2d at 783.  Accordingly, we conclude that the "defense of another" instruction was not prejudicially erroneous.

## CONCLUSION

Based on the aforementioned authorities and reasoning, we affirm the judgments of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE